May it please the Court, I'm Dan Lindahl, appearing on behalf of the appellant, Christina McClellan. With me at counsel table is Mr. Jeff Whittle, who tried this case on behalf of the appellant. I would like to reserve five minutes for rebuttal. The plaintiff brought conventional state law claims under Oregon law for negligence and strict product liability. She alleged that the defendants had failed to adequately warn about the risks associated with their product, a medical device known as a pain pump. However, relying on the doctrine of implied preemption, the district court refused to allow the jury to be instructed about the Federal standards that applied to the defendants and their duties to warn about the risks associated with their product. And further relying on the doctrine of implied preemption, the district court refused to allow the jury to hear from the plaintiff's FDA regulatory expert, who would have testified about whether the defendants complied with their duties. Those rulings based on implied preemption were erroneous and require a remand for a new trial. My comments this morning will focus on the implied preemption issue, as did the briefing of the parties, but to the extent there is time available, I will also address the other two issues raised by the appellant in support of her arguments for a remand. Those are these. First, there is the district court's decision to preclude testimony from expert witness, a statistician and epidemiologist, Dr. Sandra Greenland. Dr. Greenland would have testified to the question whether a study, a retrospective cohort study of clinical data, supported a causal link between pain pump use and resulting chondrolysis. The other issue raised by the appellant involves the district court's decision to admit only redacted versions of three letters that went from defendant DJO's consultant to DJO, which notified DJO of the FDA's view about whether use in a joint, intraarticular use, was within the clearance granted by the FDA. So the jury never heard that the FDA's view was that it was not. Turning first to the issue of implied preemption and the question of whether the district court properly did not allow plaintiffs' requested jury instructions to be submitted to the jury, we begin, as we do in all preemption cases, with this. Does the presumption against preemption apply here? And it does. Why does it apply here? Because this case involves a realm traditionally regulated by the States, public health and safety. That has always been a realm in which the States have principally regulated, and that is what this case is about. And it is especially true in this case that the presumption against preemption should have great vigor because we're not even talking about express preemption here. There is an express preemption provision in the medical device amendments, but there is no contention by the defendants that the express preemption provision applies. Instead, the argument is that it is implied. And so as we search for congressional intent, which must be found in order to find preemption, we must search even harder here under the defendant's theory because the theory is it's implied. Now, where does this implied preemption doctrine come from? Well, the parties have briefed at great length the United States Supreme Court's decision in Buckman v. Plaintiffs' Legal Committee, and that's what this case is about with respect to the implied preemption argument. There are several reasons why the implied preemption doctrine that emerges from Buckman has no application to this case. First of all, on a very simple level, Buckman involved the claim that the defendants had misled, had lied to the FDA. There is no claim of any kind, no allegation of any kind similar to that in this case. Furthermore, Buckman involved communications between the defendant in that case and the FDA. That was what was at issue, and that's what the plaintiffs were complaining about was that the defendants had lied to the FDA and led the FDA to make a decision, a wrong decision, based on incorrect information. The nature of the communication is critical to the Buckman analysis. This Court has said so in the data decision cited in our brief, 630F3-1225. This Court, the Ninth Circuit, said Buckman preemption doesn't apply where the claim involves communications running from the defendant to the consumers, the doctor, the user of the drug or device, versus to the FDA. In this case, the complaint is that the defendants didn't warn plaintiffs' doctor about the risks. There was no claim and no allegation and no jury instruction that we're complaining about having not been given that talks about, oh, the defendant should have said more to the FDA. That's just not part of this case. This Court has said that in GATA. The Eighth Circuit said it in Lefever v. KV Pharmaceutical, 636F3-935. I specially point out the Eighth Circuit's decision for this reason. The defendants rely on the Eighth Circuit's decision in the Medtronic Sprint Fidelis Leeds case. So it's a preemption case, a Buckman preemption case involving a medical device. But in Lefever, Medtronic involved communications between, again, the regulated entity, the defendants, and the FDA, whereas Lefever says Buckman preemption doesn't apply here because this claim doesn't involve fraud on the FDA, doesn't involve communications with the FDA. And very recently, as this is, as you know, by way of the defendant's supplemental authorities, the Ninth Circuit recently decided the Stengel case. And there's a Petition for Rehearing in Bank pending in that case. Last I checked, it had not been ruled on yet. Well, Stengel, again, is a case involving a plaintiff's claim about the defendant's failure to comply with regulations imposing a duty to communicate with the FDA. And the panel in Stengel split decision, the two judge majority panels, said Arizona law only imposes a duty to give warnings to the consumer, you know, to the doctor, to the user of the medical device. It imposes no – it does not recognize a common-law tort for failure to communicate information to the FDA. Again, this case is all about communications to the plaintiff's doctor, the doctor who made the decision to use this pain pump, and who says he wouldn't have used it if he had only been told what had really happened, and told about the defendant's efforts to get it cleared for joint use, and that those efforts had been rejected. Now, another aspect, another reason, another distinction between our case and Buckman is that Buckman involved this somewhat convoluted theory that had you told the FDA the truth, the FDA would have disapproved this product, it would have never reached the market, it would have never been prescribed. We don't have any of that here. We don't have any element of speculation about what the FDA would have done if only the defendants had given the FDA the right information, because we're not complaining about anything like that. And then, finally, what is the defendant's theory, overarching theory? The defendant's overarching theory is that a State law claim cannot rely on a – on a violation of a Federal standard, that you – you just – you just can't, that it's all preempted. It's all preempted. Well, that argument is implausible on its face because the Supreme Court tells us so. The Supreme Court has addressed express preemption twice. The book ended around Buckman. The Supreme Court decided lower, and in 1996, I think, and said not all State law claims are preempted by the express preemption provision. Conventional State law claims, such as failure to warn, that preceded the express preemption provision and the medical device amendments, live on. Regal says the same thing. A State law claim that doesn't impose requirements different from and additional to what the Federal regulatory scheme imposes survive. And so we're supposed to believe that when Justice Stevens and Justice Scalia were writing these opinions, they were just holding back, oh, by the way, actually, everything's preempted. We're just not telling you so. We're saying these claims exist, but they really don't. That is an implausible interpretation of a doctrine preemption that's supposed to only be found when there is clear congressional expression of intent. Now, the implied preemption rulings seeped beyond the jury instructions, also into the testimony of Dr. Suzanne Parisian, an FDA regulatory expert. And we complain on appeal about the district court's decision to not allow Dr. Parisian to speak on behalf of the to testify to what we were required to put on, which was, what was the standard of care applicable to these defendants, and did they comply? Under Oregon law, it's undisputed. We were required to put that on. And what's interesting about this issue is that the defendants don't argue about what the law is. They don't argue that such testimony would have been permissible. What they really argue is that the district court didn't prevent you from doing it. So we have a debate about sort of a procedural, historical fact within the confines of the litigation versus whether, in fact, we were entitled to put on this evidence that, in our view, we were precluded from putting on. So what's a --- here's what I think we need to do. Let's take a look at what the defendants asked the district court to do. Well, at docket number 444, that's DJO's motion. Docket number 444, that's IFLO's motion, where they moved for the district court to exclude any evidence of FDA any violation of FDA regulations. IFLO's motion specifically mentioned Dr. Parisian's report and her proposed testimony that IFLO had violated FDA regulations. That's what they wanted excluded. That's what they asked for. And then the district court complied and said we'll have no testimony about duties or that any duty was violated. And so we didn't ask her that. Her testimony appears on September 22, 2010, pages 303 to 512. Mr. Whittle never asked her those questions. He never asked her, tell us what the standard is, and did they comply. Why? Because he was have when they go back to the jury room. We never heard that they did anything wrong. We never heard they did anything wrong. Now, the third issue on appeal involves the testimony of Dr. Sandra Greenland. Dr. Greenland, the author of the leading treatise on epidemiology, studied some clinical data, a study of some 177 patients who had undergone shoulder surgery, all by the same surgeon, all by the same surgeon. So it was sort of bounded that way. It eliminated surgeon error primarily as a possible explanation or a confounding factor. Some of these patients received a pain pump. Some did not. Some developed chondrolysis in their shoulder. Some did not. What was interesting about this group of 177 patients, every patient who developed chondrolysis also got a pain pump. No patient who got chondrolysis did not get a pain pump. Now, you could say, and the district court did say, well, it's pretty obvious what that means, and certainly that evidence, as Dr. Greenland admitted, you don't have to be a Ph.D. to see that there is a strong association between pain pump use and chondrolysis. And I want to emphasize here, because I sort of skipped over it, causation was a significant issue at trial. The defendants denied then, and they deny now, that using the pain pump can cause this condition, that it can cause you to lose all your cartilage, that it can cause you to wind up with your bones all fused together and no use of your arm. So causation was important. And they attacked this Hansen data, Beck data, Hansen-Beck data. It goes by a number of terms, but it's the same thing. It's this study of 177 patients. They said it doesn't mean anything. It means something else. It could have been this or that or the other thing, and they have every right to do that and challenge it. But we have every right to bring in an epidemiologist who can not only say, I studied this and I applied statistical and epidemiological standards to this data, but I did more than that. I looked at whether this explanation, this association, could be the result of chance alone. And applying standard methodology used by experts in this field, he concluded, under the different approaches he applied, this couldn't just be an accident. It's a relatively small sample size, so it was only 177 patients, and of them, not all received the pain pump. So we wanted to be able to give the jury the tools to assess this data, and we were denied the opportunity to do that. That was error, and that also warrants a new trial. Kagan. Is that your strongest evidence of causation? No, Your Honor, it's not. There was other causation evidence at trial. That was just simply, that was really, it was a piece of the puzzle. You know, we don't contend that Dr. Greenland was the whole causation picture at all. So my question was, was that your strongest evidence of causation? No. Okay. But it was unique in that it was the only analysis of that data. And they had the report. Excuse me? The jury had the report. They did. They did. They heard the raw. Yes, they did, Your Honor. Now, the fourth and final issue we raise on appeal, and this only pertains to the DJO defendants, so I want to make sure I clarify that, is the exclusion, or I should say the admission, but only in redacted fashion, of Exhibits 45, 46, and 47. Those are in the second volume of the excerpt of record at pages 210, 218, and 234. Now, this is an interesting piece of the case. C.L. McIntosh is a regulatory consultant. They work with companies that have to deal with the FDA. And C.L. McIntosh sends some letters to DJO and says, we talked with the FDA, and this is what the FDA told us. And that portion of these letters, what the FDA told us, that was excluded. That was redacted. That never reached the jury. Now, okay, it's a long trial. There's a lot of evidence. But this was more than just any piece of evidence. This was evidence that the FDA, when asked by the consultant, the consultant says, well, you have cleared this for use in the interoperative site. Does that include in the joint space? And the FDA says, no. You need to come to us with a whole new 510K application to get clearance for that. That's not, those are two different things. Well, so, so DJO knows this. They know that there is no, that in the FDA's view, there's no track record of use of this type of product for this application, which is what the 510K process is all about. There's been a long history of use, and you can infer some level of safety from the fact that it's been out there. So DJO learns that, in the FDA's view, there is no long track record of use in the joint for this product. And so what do they do? How do they respond? Did they do any studies? Did they worry about it? Did they concern themselves whether there could be a risk? The jury was entitled to know what DJO knew so they could evaluate DJO's reaction, but they weren't told what DJO knew. And that was the purpose of putting it in. We didn't put it in for the truth of the matter. We put it in to show, notice to DJO that FDA held a view different from what DJO had been told by IFLO and what DJO was apparently telling itself or believed. The jury was deprived of that evidence. That was the only evidence that they would have had about the FDA's view of what or whether the existing clearance included this use in the joint space. And it left the defendants with a free field to argue at trial, as they did, and as I perhaps will today. This was cleared for use in the intraoperative site. That included the joint space. And nobody ever told us different. Well, they were told different, just the jury didn't know it. So your position is that the gist of that notice doesn't come through in the redacted exhibits. That's exactly right, Your Honor. You compare those side by side. Every place it says FDA thinks, FDA said, FDA anything, the gist, what comes through for sure is that C.L. McIntosh says, we don't think the two line up. But why C.L. McIntosh believes that doesn't come through. Is C.L. McIntosh the consultant? They are the consultant. Yes. I'm sorry. And so I would submit, knowing that the FDA, the regulatory entity, holds this view is significant, and a jury would have found significant in assessing the reasonableness of DGO's actions. I've used my time. I will sit down. May it please the Court, my name is Andrew Cleavorn, and I appear on behalf of the Appley and Cross Appellant IFLO Corporation. I'm joined by counsel for DGO at counsel table. And with Court's permission, we would like to split our time and argument with me taking approximately 12 minutes and DGO taking the balance. In addressing the issues raised in this appeal, it's important to remember that the three weeks. During the course of that trial, though the plaintiff pursued various theories of liability, two of her core theories of liability directly arose out of the FDA's regulation of IFLO's medical device. First, that IFLO marketed its device for intra-articular use, and that's just a fancy way of saying putting it in the joint, for intra-articular use, without having obtained an FDA 510K clearance. It marketed it without obtaining that clearance. That was their first argument. And second, that when IFLO went to the FDA and sought a specific 510K clearance for intra-articular use and was unsuccessful in doing so, that that was a signal that gave rise to a duty to warn on the part of IFLO. After careful consideration of that evidence that was presented to the jury, the jury returned a verdict in favor of IFLO. Let me pause one minute here and just give a brief overview of what 510K is. I know it's addressed in some of the Supreme Court decisions, but the 510K process is basically an instance where a medical device manufacturer goes to the FDA, says, I have a new device that I want to start promoting. It's similar to another device that's already on the market. I want to sell my device in the same fashion that that predicate device is being sold. In this instance, much of the debate, much of the claims arises out of what was the clearance that the FDA gave to IFLO for this 510K process. And necessarily, the case theories of the plaintiffs implicate FDA regulatory, the FDA regulatory structures, and decisions made by the FDA. And over IFLO's objection and DJO's objection, the district court admitted a wealth of evidence, a wealth of evidence regarding the FDA, its processes and its practices. For instance, the district court admitted expert testimony, including Dr. Parisian, who talked about the FDA clearance process, FDA standards, and the application of those standards in particular to IFLO's device. The district court admitted an internal FDA memorandum regarding the considerations of the FDA when IFLO requested a specific indication for use for intra-articulate placement. The district court permitted extensive examination of IFLO and DJO personnel regarding their actions and statements made in conjunction with the 510K process. And most importantly, the district court instructed the jury that in reaching their verdict, they could consider that FDA statute and the FDA regulations and whether IFLO or DJO had violated or not violated those statutes and regulations. That's Instruction 23 of the jury instructions. Now, this, you've heard mention of preemption in Buchman, and this is not your typical preemption case. The typical preemption case, as the most recent case from the Ninth Circuit Stengel teaches, usually arises very early in the case on a motion to dismiss or a summary judgment where the defendant says, you can't even let in the FDA regulation. You can't even let in the FDA statute because it's preempted. Here, what happened was the district court let in all of the FDA regulations, let in all of the FDA statutes. So the only thing that the plaintiff can find to complain about is that the district court did not give a particular instruction that said if you find IFLO or DJO to have violated an FDA regulation or statute, then you can find negligence per se. The district court was correct in refusing that instruction for several reasons. And first, this court doesn't even necessarily have to get to Buchman and preemption because under Oregon law, the concept of negligence per se only applies to the violation of a statute or regulation that pertains to safety. Now, here, the appellant below tried to fit within this requirement by saying that IFLO's device was either adulterated or misbranded. But that assertion is totally derivative of the FDA's 510K process. That is, under appellant's theory, as presented to the jury, IFLO's device was either misbranded or adulterated because either one, IFLO marketed its device without a 510K clearance, or two, it did not have a proper warning on the device because of the 510K regulatory history for the device in which it withdrew a request for intra-articular placement. Both of these are derived, wholly derived, from the case of Medtronic v. Lohr. The 510K process is, quote, focused on equivalence, not safety. This court reached the same result in the PhotoMedx decision, as did the Sixth Circuit in the recent case of Rodriguez v. Stryker, in which the Sixth Circuit said, quote, the 510K process does not comment on safety. Thus, because appellant's claims are wholly based on the 510K process, negligence per se does not apply under Oregon law, and it would have been error for the district court to provide that instruction. Now, turning to Buckman. Buckman does, in fact, preempt the negligence per se instruction that the plaintiff asked for here. Now, plaintiff would like you to believe that Buckman stands for the simple proposition that it only preempts State law causes of action that assert fraud on the FDA. But Buckman stands for much more than that. In fact, as this Court said in PhotoMedx, Buckman operates to, quote, limit the ability of a private plaintiff to pursue claims under State law theories where such claims collide with the exclusive enforcement power of the Federal Government. But appellant's theories here would do exactly that. They would interfere with the regulatory decisions and the enforcement actions of the FDA. Take, for example, the claim that iFlow marketed its device without having a 510K clearance. To prove that claim, the plaintiff below had to show two things. First, what's the meaning of that clearance? And in particular, does the clearance that iFlow actually obtained for intraoperative use include within its ambit intraarticular use? That's one interpretive question that was actually placed before the jury here. The second question that the jury then had to confront was, was iFlow's marketing of its device, was its promotion of its device inside or outside that clearance? But as the Ninth Circuit found in the PhotoMedx decision, the decision as to whether the marketing of a particular device falls within the scope of an FDA 510K clearance lies within the exclusive authority of the FDA. It's up to the FDA to decide whether a particular device complies with the 510K clearance that the FDA has provided. And what plaintiff would like to do is to substitute its judgment for the judgment of the FDA as to whether a particular clearance, a particular device has been marketed within the scope of the clearance or outside of the scope of the clearance. The same is true with respect to appellant's theory with respect to whether there was a signal arising out of the 510K intraarticular requests. If, in fact, the FDA believed that iFlow's withdrawal of its request for a specific clearance for intraarticular use gave rise to a risk, the FDA had a plethora of enforcement actions available to it to prevent such marketing. It could have required iFlow to include a warning on its device. It could have included a contraindication on the device, essentially recommending to doctors that while you may use it this way, we think there is some risk involved in that. Or, even more drastically, the FDA could have actually required iFlow to recall the medical device from the marketplace. The FDA did none of these things when iFlow withdrew its request for a specific clearance for intraarticular use. And, again, what the plaintiff would like to do is to have her negligence per se instruction substitute for the enforcement decisions of the FDA. That is not allowed under Buchman. It's not allowed under this Court's decision under Fotomex. And allowing a negligence per se instruction, as the plaintiff would have liked the Court to do here, would have been error. In fact, the district court got it just right. It said, I'm going to let in the FDA regulations and the discussion of the FDA regulations, because I think they are informative as to what the standard of care is, but they do not fix the standard of care. And what the plaintiff would like to do is take an FDA regulation from the CFRs, somewhere or another, place that before the jury, say, well, gosh, there's a violation of that CFR, and therefore, there must be a private cause of action as well. And that's exactly what Buchman is attempting to prevent. Now, it's true that Buchman does not preempt traditional State law theories, but these are not traditional State law theories that were being asserted here. What they were essentially saying is that iFlow was marketing beyond a license provided by the FDA. There's no traditional State law tort of your what the regulatory history with the FDA. But there's no traditional State law tort claim of you're not selling your things in compliance or you have a duty to warn of the regulatory history. That's not the case here. So I used up almost 12 minutes of the time. What I would like to emphasize to the Court is, as I stated at the beginning of the hearing, there is no reason to undo the hard work of the district court here. If you have no further questions, I'll turn it over. Good morning, Your Honors. Richard Nakamura on behalf of DJO. It's very much a privilege to be here in Portland this morning. I'm going to begin my remarks by addressing the issue that is unique to my client, the issue of the redaction of the C.L. McIntosh letters, and then briefly supplement some of the arguments made by my co-counsel on the preemption issue. The argument on the redacted letters, I believe, rests on a false distinction that plaintiff is drawing between two different types of notices, which is really one and the same thing. If you look at their reply brief and if you listen closely to the argument that was made this morning, the distinction that they are drawing is that, yes, it's true, DJO had noticed that the FDA did not clear the device for intraarticular placement, but that's not the notice that these redacted portions of the letter were being offered for. The argument that they're making is that the notice that the redacted portions of the letter are being offered for is notice that the general use clearance, which is the clearance for use in an intraoperative site, excluded the specific use of intraarticular placement. And I submit that's a distinction without a difference, whether it's notice to DJO that the device wasn't cleared for intraarticular placement or that the FDA believed that the specific clearance was not broad enough to include intraarticular placement is, number one, a distinction without a difference. But I think more fundamentally, it can't be reconciled with the undisputed testimony of witnesses, including plaintiff's own expert witnesses, that the FDA itself did not define the term intraoperative site. So if the FDA does not define what intraoperative means, and plaintiff's own regulatory expert acknowledged that, then it's incongruous, isn't it, to then say that these double hearsay statements of FDA employees should be offered as some sort of interoperative site. So I think for those two reasons ‑‑ DR. SCHUNEMANN I know my shoulder bothers me. And I've got some problems with my cartilage. Now, where would they stick that device that relieves the pain? It would be placed wherever the doctor in his or her professional judgment thinks it ought to be placed. And that goes to a core issue on the preemption analysis, because the device was initially cleared for use in what is called the intraoperative site. And everyone at trial agreed that ‑‑ Kennedy. Interoperative site has got to mean where they operate on you, and they stick it in there. DR. SCHUNEMANN Correct. And so Dr. Piola, Mrs. McClellan's treating physician, was operating on the glenohumeral ‑‑ I can't pronounce it correctly ‑‑ joint. That was the intraoperative site. It happened also to be intraarticular, but no one ‑‑ DR. SCHUNEMANN That's where they ‑‑ that's where the joints come together. Yeah. Because, well, that's where the pain is. DR. SCHUNEMANN That's right.  Intraarticular. DR. SCHUNEMANN That's right. So when they put that needle in, where is the risk? The intraarticular or the ‑‑  DR. SCHUNEMANN ‑‑ intraoperative. Intraarticular. DR. SCHUNEMANN The ‑‑ what happened in this case is that the treating physician used a mixture of drugs, which, as a result of repeatedly filling ‑‑ well, twice filling the bag, contrary to the instructions, caused the cartilage in Ms. McClellan's joint to eventually disappear, resulting in the fusion of the bone. Would that cause it to dissolve? I mean, how does it disappear? DR. SCHUNEMANN I wish I had a plain English answer for that, Your Honor. But the jury didn't know, did they, whether it was ‑‑ You've been doing this for a long time. The jury didn't know, and that's sort of the question, isn't it, whether it's this device or the medicine put in the device? But you just said that the medicine caused this condition, this horrible consequence. DR. SCHUNEMANN Well, this ‑‑ it's like a catheter, and you have medications inserted through the catheter into the joint. DR. KAYESS Right. But maybe I read too much into your comment, but I thought you were suggesting that it was the selection of that particular type of medicine. DR. SCHUNEMANN That's not an issue. DR. KAYESS Okay. Okay. So I appreciate that clarification. I just want to mention that what we're talking about, the device that was marketed is ‑‑ the way I think of it is an empty vessel, an empty syringe, if you will. I realize it's not a syringe, but there was a question, hence the ‑‑ I think the Greenland expert and other folks were talking about whether or not the problem was really the device, the constant delivery to the ‑‑ to the joint. DR. SCHUNEMAN Correct. DR. KAYESS Versus the selection of the type of medicine. Is that right? DR. SCHUNEMAN Correct. But the issue arose because the contention is that the clearance for intraoperative use did not authorize or permit an intraarticular placement. And that is where you have the collision arising between a jury making that call and the clearances that the FDA gave to this device. I mean, there is one statement that my opponent made in his comments with which I absolutely agree, and that is, under Buchman, it is the nature of the communications with the FDA that's key. And is there any doubt in Your Honor's mind that but for two communications with the FDA, we would not be here today talking about negligence per se. The first communication was IFLO's securing the general use clearance for use in the  DR. SCHUNEMAN So that could be any place in the body, then. DR. SCHUNEMAN Correct. It's wherever the doctor wants, in his judgment, thinks the device ought to be placed. That's the first communication, getting a general use clearance for use in the intraoperative site. The second communication was that the device was inherently defective. Correct. Because of a failure to warn that this device was not cleared for intraarticular placement. And our position is that the general clearance, the broad clearance for use in the DR. SCHUNEMAN included that, and the conflict arises under Buchman because, to go back to my two communications point, the second communication was actually a series of communications with the FDA, was IFLO's attempts, repeated applications, to get a specific clearance for intraarticular placement. The FDA, though, could not find a predicate device that was specifically cleared for intraarticular placement, so thus it declined to issue the specific clearance. And it is that decision, if you will, the FDA's inability to find a predicate device with this specific use for intraarticular placement, it's that decision that the jury, under the guise of these negligence per se instructions, is being invited to infer made the device dangerous, misbranded, whatever statutory violation you want to rely upon in that list of special instructions, 8 through 15. Kagan. Could I ask two questions? One is, how many times did they request approval for specifically for use in a joint? Was it three? I believe it's three. My client's the distributor. So we're talking about the decision made three times by the FDA. To decline the specific. And were all of the – were all of those on the basis that they couldn't find a predicate device? Yes. Okay. Then my other question is going back to the exhibits that were excluded, did the district court exclude those on the basis of hearsay? Which ones are we talking about? The communications between the author by the consultant to DJO. Yes. They were double hearsay. No other reason given. So what's your response to plaintiffs' – I'll use the term plaintiffs' argument that they were not hearsay because they were not offered to prove the truth of the matter asserted. They were offered to prove notice, as I understand his argument, to DJO. Well, I address the notice, right. Right. Notice to DJO that the FDA had not approved this device for use in a joint. Right. He said it much more articulately, but that's what I want to know your answer to. That's the gist of it. Actually, the position that they take in their briefing, Judge Kirsten, is that it is admissible because it reflects an adoptive admission. Well, they make both arguments. I don't want to hear about the adoptive admission one. I want to know if I could direct you, because I know your time is ticking. Okay. Your response to the hearsay argument. They're arguing that it was not offered to prove the truth of the matter asserted. One of their arguments is that it was just offered for notice. Again, this goes back to my original argument on this. That it's a distinction without a difference, because the notice for which they admit we had, that it was not cleared for intraarticular placement. It's the same notice to say that the specific clearance did not include, excuse me, that the broad clearance did not include intraarticular. It's sort of a mirror argument. I don't think I'm making sense, but that's the best I can do. I understand your argument. I just want to make sure we kind of went off on a tangent. I wanted to make sure you got back to your main point. And it sounds like I did hear the end of your main argument, so thank you. So I'm way over my time. Well, this could be used for any type of surgery where pain would be a consequence. That's true, Your Honor. And it's up to the physician to make the decision where to place. Why not just give you a pain pill? The Dr. Piola made a decision to use this device in lieu of giving a pain pill. I can't speak for Dr. Piola's decision to use the device. Or just Tyenol. There is. Could have used Tyenol. It could have, but again. The questions, Judge Pegerson, go to the concern that the FDA has that it does not want to get in the business of regulating the practice of medicine. And if you're going to let the jury second-guess Dr. Piola's conclusion that the joint, if you are going to let the jury second-guess FDA decisions as to the scope of a clearance, you're essentially having the FDA regulate the practice of medicine. The skill of the clearance. I mean, the scope of it. Oh, I'm sorry. Practice, yes. Well, first of all, hospitals are dangerous places. And, you know, the death rate drops when there's a big strike in a big hospital. You know that. Yes. Yeah. People don't believe that, but it's true. It's like crime drops when all the police are on vacation. Whether there's a correlation between that or not, who knows? But I take it the what's happened to this doctor? I honestly don't know, Judge Pegerson. Huh? I don't know, Judge Pegerson, what happened to the doctor. Thank you for the court's indulgence. I know we're quite a bit behind schedule, so I will endeavor to be succinct in responding to a few points by way of rebuttal. The argument was made that negligence per se doesn't fit here because the regulations that we wanted to instruct the jury about have nothing to do with safety. But, and of course they do, they're all about safety. They're about what the defendants were required to tell the doctor about the risks associated with using this product so that the doctor could make a decision, an informed decision about whether to use this device as opposed to a pain pill or a Tylenol. Because this is very different from that. It's very different from the syringe that the defendants compare this to. This is like a syringe, but it's like a syringe put in your shoulder and left there for several days. So it's the dose, this large, massive quantity of painkiller and the duration for several days that causes the cartilage cells to die. And that's what happens. That's they don't dissolve. I mean, they dissolve in a fashion. They just die, and you're left with no cartilage up here. Now ---- Kennedy, they die and go away. I'm just thinking of all my surgeries right now. Yeah. This case makes a lot of people think about their surgeries. Now, it was suggested that the FDA could have come in and solved all this, but none of the preemption cases, certainly within the body of cases we've looked at here, say because a Federal regulatory agency has enforcement rights that that preempts the right to bring State common law remedies. In fact, the case law is exactly the contrary, that the two are complementary. As Justice Stevens said, the availability of a State common law remedy is further encouragement to comply with the Federal regulations. We dispute, and this will just be a matter of the record, we dispute the assertion that we were allowed to tell the jury all about all the Federal regulations. And the place to begin, I think, is with Dr. Parisian's testimony. It's not really very long. She wasn't asked about any of these misbranding regulations that are the subjects of our jury instruction assignment of error. You've heard a lot about the specifications of negligence and the allegations about the failure to disclose that there have been three attempts to get this cleared for interarticular use and three attempts rejected. But that's only one part of this case. It's just one specification of the strict product liability claim, and it's two of the negligence allegations pertaining to what was happening with the FDA. All the others are things like maybe you should have told them this had never been tested, they had no idea about the safety of this device, that this was a new and unproven use. Those were the things Dr. Paola would have liked to have known before he prescribed this. And then with respect to the C.L. McIntosh letters, Exhibits 45, 46, and 47, as we mentioned in our brief, those letters conveyed a couple pieces of information. One was notice about the FDA's view of the clearance. But another point I want to emphasize is those letters also conveyed the FDA's view that there was an absence of testing to establish the safety of this device. And that's right in there. So DJO is being They are related, although the predicate device, if it's been out there for this use, there may be no testing, but the fact that it's been on the market for a hundred years sort of in itself creates a presumption maybe in some sort of sense. So here, not only is there no predicate device, there's no testing, and you would have to come forward with testing to get it cleared for this use. For these reasons, we ask that the judgment be reversed, the case remanded for a new trial, and on the cross-appeal, which we didn't get to ---- Kennedy. How did the doctor fit in on this litigation? Waxman. I don't believe the doctor was ever involved in this litigation other than as a witness testifying to how what he would have done had he received the warnings that we allege should have been given. Thank you. Thank you. Matter is submitted.
judges: Goodwin, Pregerson, Christen